Carolyn Ann Lesikar MOON, Individually and as Named Trustee of the Carolyn Ann Lesikar Moon Special Trust, Appellant

v.

Woody K. LESIKAR, Individually, as Trustee of the Woodrow V. Lesikar Family Trust, Trustee of the Woody K. Lesikar Special Trust, and Independent Executor of the Estate Of Woodrow V. Lesikar; West Houston Airport Corporation; Shelly Ann Lesikar, Individually and as Trustee of the S & S Trust; Stacy Jayne Lesikar Martin, Individually and as Trustee of the S & S Trust; and the S & S Trust, Appellees.

No. 14–05–00677–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 10, 2007.

Brett Wagner, Bobbie G. Bayless, David W. Holman, Mark W. Long, Houston, Vaughn O. Stewart, Lake Jackson, for appellant.

James Stephen Barrick, Jason Bradley Ostrom, Murry B. Cohen, Houston, Joe Alfred Izen, Jr., Bellaire, W. Edwin Denman, Lake Jackson, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and GUZMAN.

## MAJORITY OPINION

J. HARVEY HUDSON, Justice.

Appellant, Carolyn Ann Lesikar Moon, Individually and as Named Trustee of the Carolyn Ann Lesikar Moon Special Trust appeals the summary judgment granted in favor of appellees, Woody K. Lesikar, Individually, as Trustee of the Woodrow V. Lesikar Special Trust, and Independent Executor of the Estate of Woodrow V. Lesikar; West Houston Airport Corporation; Shelly Ann Lesikar, Individually and as Trustee of the S & S Trust; Stacy Jayne Lesikar Martin, Individually and as Trustee of the S & S Trust; and the S & S Trust (collectively "Airport Defendants"). We affirm.

### BACKGROUND

Carolyn Ann Lesikar Moon and Woody Lesikar are brother and sister. In January 1990, their father, Woodrow V. Lesikar ("Mr. Lesikar"), established the Woodrow V. Lesikar Family Trust (the "Family Trust"), naming himself and Woody co-trustees. Mr. Lesikar placed in the Family Trust 10,000 shares of stock in West Houston Airport Corporation ("Airport Stock").

The Family Trust provided that Mr. Lesikar would receive all net income from the trust assets during his lifetime. Upon Mr. Lesikar's death, the trust would become irrevocable, and separate special trusts would be created for Woody, Carolyn, Margie Pugh Morgan (Mr. Lesikar's wife), and his grandchildren. Woody's special trust was to receive all the Airport Stock, the grandchildren's trusts were to receive certain real property, and Margie's trust was to receive certain stock holdings, while the remainder was to be divided between Woody's special trust and Carolyn's special trust. Mr. Lesikar reserved the right to revoke the trust agreement or amend the trust by written notice to the trustee. In

keeping with his right to revoke, in 1991, Mr. Lesikar revoked, in writing, part of the Family Trust, removing Margie as a beneficiary.

In 1997, Mr. Lesikar decided to transfer the 10,000 shares of Airport Stock to a trust established for Woody's children (Shelly Ann Lesikar and Stacy Jayne Lesikar Martin)—the S & S Trust. On September 5, 1997, Mr. Lesikar wrote Carolyn explaining his decision. Mr. Lesikar also stated in that letter he was going to revise his will to provide for Margie, he was asking Woody to have his will redrafted, with input from Carolyn and Margie, and he might make other changes.

On March 16, 1998, Mr. Lesikar signed a new trust agreement that "modifies, amends and supersedes the Trust Agreement and any modifications and amendments previous to the date of the signing hereof." The Amended Family Trust was effective as of December 31, 1997. The Amended Family Trust placed Margie back in as a beneficiary. Upon Mr. Lesikar's death, $250,000 would be placed into a trust, with the income payable to Margie for her lifetime. Mr. Lesikar's grandchildren would each receive $10,000; Shriner Children's Hospital would receive $50,000; and the remainder would be divided equally between Woody and Carolyn and distributed to their respective special trusts. The Amended Family Trust did not mention the distribution of the Airport Stock to Woody as the original trust had.

Mr. Lesikar sold the Airport Stock to Woody for $2,000 for the benefit of the S & S Trust. On his 1997 federal income tax return, Mr. Lesikar claimed a $191,228 loss from the sale, which he used to offset a $1,674,203 gain from the sale of other stock. Although the tax return, which is dated February 24, 1998, states the sale of the stock took place on December 30, 1997, Mr. Lesikar did not receive the $2,000 until December 1998. The assignment of the Airport Stock to the S & S Trust is dated December 30, 1998.

On January 28, 2001, Mr. Lesikar died thereby making the Amended Family Trust irrevocable. On August 19, 2003, Carolyn filed a petition for construction of trust, declaratory judgment, accounting, appointment of a receiver, and injunctive relief against the Airport Defendants. Complaining of the sale of the Airport Stock to Woody for $2,000 as an inadequate price, Carolyn brought claims for negligence, breach of fiduciary duty, conversion, and civil conspiracy against Woody, and civil conspiracy against the S & S Trust.

Carolyn, Woody, and the Airport Defendants moved for summary judgment on the issue of the sale of the Airport Stock to Woody. The trial court denied Carolyn's motion for summary judgment, and granted Woody's and the Airport Defendants' motions for summary judgment. The trial court ordered the portion of the case relating to the sale of the Airport Stock severed from the remainder of the case. Carolyn appeals the denial of her motion for summary judgment and the granting of the appellees' motions for summary judgment.

## STANDARD OF REVIEW

To prevail on a motion for summary judgment under 166a(c), the movant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law. *Browning v. Prostok,* 165 S.W.3d 336, 344 (Tex.2005). In conducting our review of the summary judgment, we take as true all evidence favorable to the nonmovant, and make all reasonable inferences in the nonmovant's favor. *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex.2005). A defendant is entitled to summary judgment on an affirmative defense if the defendant pres-

ents evidence that establishes each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996). When a trial court's order granting summary judgment does not specify the grounds upon which it relied, we must affirm the summary judgment if any of the summary judgment grounds presented are meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex.2000).

### STANDING

■ In her tenth issue, Carolyn claims the trial court erred in granting summary judgment in favor of appellees on the ground that she lacked standing to complain about the sale of the Airport Stock because she had no interest in it at the time of the sale. Carolyn asserts, as a matter of law, the 1997 Amended Family Trust was in effect at the time of the sale of Airport Stock. Carolyn contends because the 1997 Amended Family Trust makes no mention of the Airport Stock, it is part of the residuary to be divided between her and Woody. Clearly, if the 1990 Family Trust was in effect at the time of the sale, Carolyn had no interest in the Airport Stock because the Trust specifically provided Woody's special trust was to receive the stock. However, even if the 1997 Amended Family Trust was in effect at the time of the sale, for the reasons stated below, we conclude Carolyn has no standing to challenge the sale of the Airport Stock.

Carolyn argues, as a beneficiary of the Amended Family Trust, she has standing to bring this cause of action. "Any *interested person* may bring an action under Section 115.001 of this Act." TEX. PROP. CODE ANN. § 115.011(a) (Vernon 2007) (emphasis added). An "interested person" is defined as "a trustee, *beneficiary,* or any other person having an *interest* in or a claim against the trust or any person who is affected by the administration of the

trust." TEX. PROP.CODE ANN. § 111.004(7) (Vernon 2007) (emphasis added). A "beneficiary" is "a person for whose benefit property is held in trust, regardless of the nature of the interest." *Id.* § 111.004(2). An "interest" is "any interest, whether legal or equitable or both, present or future, vested or *contingent,* defeasible or indefeasible." *Id.* § 111.004(6) (emphasis added).

Carolyn, as a contingent beneficiary, would appear to meet the definition of an interested person with standing to bring suit against a trustee for breach of fiduciary duty. However, Mr. Lesikar, as settlor, was empowered to revoke or amend the 1997 Amended Family Trust. Until the death of Mr. Lesikar, he was also the sole beneficiary of the 1997 Amended Family Trust. The question presented is whether a contingent beneficiary can complain of a transaction by the settlor of a revocable trust, prior to the vesting of her interest upon the death of the settlor. By the cases the parties have cited and our own research, it does not appear that Texas has addressed this issue, but other jurisdictions have.

In *Hoelscher v. Sandage,* Thelma Warren created the Thelma L. Warren Revocable Trust, which owned 67 percent of the family home and farm, while her children owned 33 percent. 462 N.W.2d 289, 291 (Iowa Ct.App.1990). Thelma and a friend were named co-trustees. *Id.* Thelma and the children mortgaged the home farm to secure an operating loan. *Id.* In a foreclosure action against the trustees and the children, the bank acquired all of the home farm except the homestead, and Thelma voluntarily revoked the Thelma Trust. *Id.* The plaintiffs, who were two of children and their spouses, sued Thelma's co-trustee for fraud. *Id.* The court noted that Thelma's children possessed an interest in the trust property which would vest only

upon the discretion of Thelma. *Id.* at 294. Under the terms of the Thelma Trust, as co-trustee and *settlor* of the Thelma Trust, Thelma *retained discretion* to use her 67 percent of the home farm "as she pleased regardless of its inclusion in the Thelma Trust." *Id.* The court, thus, held the plaintiffs lacked standing to attack the co-trustee about his actions in connection with mortgaging the trust property. *Id.*

In *In re Malasky,* the Malaskys (Harry and Marion) created a joint revocable living trust of which they were the trustees. 290 A.D.2d 631, 736 N.Y.S.2d 151, 152 (N.Y.App.Div.2002). When Harry died, another individual replaced him as co-trustee. *Id.* Harry's children from his first marriage objected to the trust accountings. *Id.* Under the trust document, the Malasky's were the only persons who had an interest in the income and principal of the trust during their respective joint lives and the children had no pecuniary interest in the trust during this period of time. *Id.* at 152–53. There was no construction of the trust giving the children any interest until Harry's death. *Id.* at 153. During the lifetime of the *settlors,* they acted as trustees, received income from the trust, and explicitly retained the power to revoke or amend the trust at any time. *Id.* Therefore, the children had no pecuniary interest in the revocable trust until Harry's death and had no right to an accounting for the period from the date the trust was created until the date of Harry's death. *Id.*

The court, in *Siegel v. Novak,* found the beneficiaries of a revocable trust could challenge the disbursements made by the trustee where someone other than the settlor made distributions from the trust. 920 So.2d 89 (Fla.App.2006). Rautbord executed an Amended and Restated (Revocable) Agreement of Trust, with JP Morgan Chase Bank as trustee. *Id.* at 91. Under the trust, all property would be divided among Rautbord's children. *Id.* After creating the trust, Rautbord executed a durable power of attorney making her daughter, Novak, her attorney-in-fact. *Id.* at 92. While Rautbord was alive, Novak made large withdrawals from the trust through the power of attorney; JP Morgan Chase Bank, as trustee, approved the withdrawals. *Id.* Applying New York law, the Florida court of appeals, held Rautbord's sons had standing to challenge the withdrawals prior to Rautbord's death because *the settlor and the trustee were not the same person. Id.* at 95. Where a person or entity different from the settlor removes property or money from a revocable trust, those withdrawals could conceivably be made without the settlor's knowledge or consent. *Id.* After the death of the settlor, the beneficiaries of a revocable trust have standing to challenge pre-death withdrawals from the trust which are outside the purposes authorized by the trust and which were not approved or ratified by the settlor personally or through a method contemplated by the trust instrument. *Id.*

We find the reasoning in *Hoelscher* and *Malasky* persuasive, and the reasoning in *Siegel* instructive. Mr. Lesikar, who was both settlor and trustee, had the power to revoke or amend the 1997 Amended Family Trust. We similarly conclude the vesting of the contingent beneficiaries' interests was subject to Mr. Lesikar's discretion before his death.

Carolyn complains the conveyance of the Airport Stock was not in writing, in accordance with Section 112.051(c) of the Texas Property Code, which provides "[i]f a trust was created by a written instrument, a revocation, modification, or amendment of the trust must be in writing." TEX. PROP. CODE ANN. § 112.051(c) (Vernon 2007); *see also Runyan v. Mullins,* 864 S.W.2d 785, 788 (Tex.App.-Fort Worth 1993, writ de-

nied) (quoting RESTATEMENT (SECOND) OF TRUSTS § 331 cmt. d (1959)) (" '[I]f the Settlor reserves a power to modify the trust only in a particular manner or under particular circumstances, he can modify the trust only in that manner or under those circumstances.' ").

In *Starcrest Trust v. Berry*, the trial court found the settlor's execution of a deed of trust pledging certain trust property to secure a loan, manifested the settlor's intention to revoke the trust. 926 S.W.2d 343, 352 (Tex.App.-Austin 1996, no writ). The court of appeals rejected the plaintiffs' argument that there was no evidence to support the trial court's finding because there was no evidence of a formal written revocation of the trust under section 112.051(c) of the Texas Property Code, which requires that changes to a written trust agreement also be in writing. *Id.* at 353. Instead, the court of appeals stated the intent to revoke must be shown in the instrument used to revoke, although it need not expressly refer to the power to revoke, and that revocation occurred by the settlor's conveyance of the trust property to a third person. *Id.* (quoting Bo-

gert, THE LAW OF TRUSTS AND TRUSTEES § 1001).

■ Carolyn argues *Starcrest Trust* is distinguishable because the entire corpus of the trust in that case was conveyed out of the trust. We do not read *Starcrest Trust* as limited to factual scenarios in which the entire trust corpus has been conveyed to a third party. Instead, we believe the reasoning of the *Starcrest Trust* applies equally to cases, such as the one here, where the settlor has conveyed only part of the trust corpus to a third party.[1] We conclude Mr. Lesikar showed his intent to revoke the Family Trust with respect to the Airport Stock by his conveyance of that stock to the S & S Trust.

Carolyn further complains Mr. Lesikar did not provide written notification of revocation to himself or Woody, as trustees, as required by the 1997 Amended Family Trust:

> 10.1 While the Settlor is living, he may revoke this Trust Agreement by written notice to the Trustee. The Settlor may amend this Trust Agreement by written notice to the Trustee (unless

---

1. Other jurisdictions hold the transfer of trust property out of the trust is a revocation to the extent of that property. *See, e.g., In re Estate of Coleman,* 129 Cal.App.4th 380, 28 Cal. Rptr.3d 282, 287 (2005) ("If the trust reserves the power in the settlor to withdraw trust property from the trust, as here, the withdrawal terminates the trust as to the property withdrawn."); *Siegel,* 920 So.2d at 95 ("[A] settlor/trustee's withdrawal of funds from a revocable trust is tantamount to a revocation or termination of the trust with respect to the funds withdrawn."); *Paul v. Arvidson,* 123 P.3d 808, 811 (Okla.Civ.App.2005) ("'[Settlor/trustee's] acts of creating a conflicting trust that was meant to include all of his property and then specifically conveying the subject property to that Trust by General Warranty Deed is clear evidence of his intent to revoke Trust No. 1 as to that property.").

Additionally, a number of commentators have reached the same conclusion. *See, e.g.,*

George Gleason Bogert, THE LAW OF TRUSTS AND TRUSTEES § 1001, p. 336 (Rev.2d ed. 2005) ("Revocation may be held to have occurred by means of a conveyance by the settlor to a third person that covers the trust property."); Austin Wakeman Scott, THE LAW OF TRUSTS § 330.11, p. 371 (1989) ("Where [the settlor] simply reserves a power in general terms to revoke the trust, he ordinarily has power to revoke it in part by withdrawing some of the property from the trust."); RESTATEMENT (THIRD) OF TRUSTS § 63 cmt. e (1991) ("A power simply to revoke the trust, however, is interpreted as including also the power to revoke the trust in part, thus allowing withdrawal of some rather than all of the property from the trust, if that is all the settlor wishes to do."); 76 AM.JUR.2D *Trusts* § 76 ("The revocation of a trust may be held to have occurred by means of a conveyance by the settlor to a third person that covers the trust property.").

waived); provided, however, the Trust Agreement may not be amended to change the obligations, duties, or rights of the Trustee without the written consent of the Trustee.

 When the trustee is also the settlor of the revocable trust, the settlor is not required to serve written notice on himself. *See, e.g., Argo v. Moncus,* 721 So.2d 218, 222 (Ala.Civ.App.1998) (holding settlor/trustee was not required to give written notice to herself that she was deeding her home to another); *Paul,* 123 P.3d at 809–10 (refusing to impose a technical requirement that the settlor/grantor deliver written notice to himself). "It would be absurd to require the settlor to call himself up on the telephone as trustee and tell himself that he is revoking the trust. It would be equally absurd to have the settlor send himself a letter as trustee to inform himself as trustee that the trust is terminated." *Barnette v. McNulty,* 21 Ariz. App. 127, 516 P.2d 583, 586 (1973). Similarly, we see no reason to impose this technical requirement when Mr. Lesikar was both settlor and trustee and he effectuated the sale of the Airport Stock in his capacity as trustee of the 1997 Amended Family Trust.

We conclude that because Mr. Lesikar was the settlor of the trust with the power to revoke the trust, the sole beneficiary of the trust while alive, and co-trustee of the trust, Carolyn has no standing to complain of Mr. Lesikar's disposition of Family Trust assets, including the Airport Stock. The court did not err in granting Woody's and the Airport Defendant's motion for summary judgment and denying Carolyn's motion for summary judgment. Carolyn's tenth issue is overruled.[2]

Accordingly, the judgment of the trial court is affirmed.

GUZMAN, J., concurs.

EVA M. GUZMAN, Justice, concurring.

I agree with much of the reasoning of the cases on which the majority relies, but those cases are more suited to an analysis of standing under the common law rather than a determination of standing conferred by statute. Here, we need not look outside the Texas Trust Code to determine whether Carolyn has statutory standing. Thus, although I agree with the majority's disposition of the case, as a threshold matter I would hold that Carolyn has standing to bring her claims under the Texas Trust Code. I would therefore reach the same result as that stated by the majority only after considering Carolyn's claims on the merits. Accordingly, I concur in the result reached by the majority, but write separately on the merits of Carolyn's ten issues.

## I. STANDING

Standing may be predicated on statutory or common-law authority. *See Williams v. Lara,* 52 S.W.3d 171, 178–79 (Tex.2001); *Everett v. TK–Taito, L.L.C.,* 178 S.W.3d 844, 850 (Tex.App.-Fort Worth 2005, no pet.). When standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis. *Everett,* 178 S.W.3d at 851; *In re Sullivan,* 157 S.W.3d 911, 915 (Tex.App.-Houston [14th Dist.] 2005, orig. proceeding).

Applying the statutory framework, the majority notes that Carolyn, "would appear to meet the definition of an interested person with standing to bring suit against a trustee for breach of fiduciary duty." I agree. Although the majority then looks to the common law of other jurisdictions and finds an exception to the standing conferred by the Texas Trust Code, I would confine the analysis to the provisions of relevant statutes. *See In re Sulli-*

---

**2.** Because of our disposition, we need not address the other issues raised on appeal.

*van,* 157 S.W.3d at 920 (holding that the Texas Family Code confers standing on a purported sperm donor to maintain suit adjudicating parentage and stating that "[u]nless and until the Texas Legislature amends the Texas Family Code to achieve the result [relator] urges, there is no basis to deny standing").

"The determination of whether a plaintiff possesses standing to assert a particular claim depends on the facts pleaded and the cause of action asserted." *Mazon Assocs., Inc. v. Comerica Bank,* 195 S.W.3d 800, 803 (Tex.App.-Dallas 2006, no pet.). Texas courts have historically recognized a distinction between the analysis employed in reviewing common-law and statutory standing. *See Williams,* 52 S.W.3d at 178 ("As a general rule of Texas law, to have standing, *unless it is conferred by statute,* a plaintiff must demonstrate that he or she possesses an interest in a conflict ... such that the defendant's actions have caused the plaintiff some particular injury.") (emphasis added); *In re Sullivan,* 157 S.W.3d at 915 ("[T]he judge-made criteria regarding standing do not apply when the Texas Legislature has conferred standing through a statute."). Because Carolyn claims standing under the Texas Trust Code, "the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls in that category." *In re Sullivan,* 157 S.W.3d at 915.

Under the relevant terms of the Trust Code, I would conclude that Carolyn is an interested person entitled to bring suit. *See* Tex. Prop.Code Ann. §§ 111.004(2), (6), (7), (25), 114.008, 115.001, 115.011 (Vernon 2007).[1] Accordingly, I would sustain Carolyn's tenth issue and address her nine remaining issues on the merits.

## II. Trust in Effect at the Time of the Stock Sale

In her third and fourth issues, Carolyn argues that the 1997 Amended Family Trust was in effect at the time the Airport Stock was sold, or in the alternative, that there are genuine issues of material fact concerning which Family Trust instrument was in effect at the time of the sale. Although Carolyn correctly points out that there is a question of fact regarding the date the stock was sold, I would hold that this is not a material fact, considering the similarity of the key terms of the two agreements. Under both trusts, the settlor has the right to revoke or modify the trust upon written notice, and the trustee is authorized "to enter into any transaction on behalf of the trusts despite the fact that another party to the transaction is (I) a trust of which a Trustee of these trusts is also a trustee, ... [or] (iii) a Trustee or any one or more of the beneficiaries acting on their own behalf...."[2] In light of the similarity of these key provisions addressing the rights of the settlors and the trus-

---

1. I disagree with the majority's conclusion that Carolyn had no interest in the Airport Stock under the 1990 Family Trust. Carolyn was a contingent beneficiary, and the stock would pass to her if Woody died without living descendants. Under the terms of the Texas Trust Code, this contingent interest is sufficient to confer standing. *See* Tex. Prop. Code Ann. §§ 111.004(2), (6), (7); *In re Estate of Bivins,* No. 07–01–0131–CV, 2002 WL 1478661, *1 (Tex.App.-Amarillo July 10, 2002, no pet.) (not designated for publication) (holding that a contingent beneficiary of a trust has

a justiciable interest and standing to prosecute the suit). Carolyn also has standing as a remainderman under the 1997 Amended Family Trust. *See Yturri v. Yturri,* 504 S.W.2d 809, 812 (Tex.Civ.App.-San Antonio 1973, no writ) (holding that a remainderman as to the corpus of a trust "is clearly a person 'actually interested' " and has standing to maintain suit under the predecessor to the Texas Trust Code).

2. 1990 Family Trust, Art. VII, § 7.1(h); 1997 Amended Family Trust, Art. VII, § 7.1(h).

tees, I would overrule Carolyn's third and fourth issues.

### III. Woody's Alleged Breach of Duty to Carolyn

In her first issue, Carolyn argues that the trial court erred in denying her motion for summary judgment because no competent evidence proved that Woody's purchase of the Airport Stock was fair. Similarly, she argues in her second issue that the trial court erred in granting the Lesikar Defendants'[3] counter-motion for interlocutory summary judgment because Woody's alleged self-dealing in purchasing the Airport Stock was not excused by exculpatory language in the trust. In her eighth issue, Carolyn contends that Woody had a fiduciary obligation as co-trustee to avoid self-dealing transactions, "even if the Family Trust was revocable and even if [the Settlor] participated in and directed those transactions."

This argument is rebutted by the terms of the trusts and of the Trust Code. As previously noted, Article VII, section 7.1(h) of each trust permits such "self-dealing." Moreover, at the time the summary judgment motions were filed, heard, and decided, the Texas Trust Code provided as follows:

> If a trust instrument reserves or vests authority in any person to the exclusion of the trustee, including the settlor ... to direct the making or retention of an investment or to perform any other act

in the management or administration of the trust, the excluded trustee or cotrustee is not liable for a loss resulting from the exercise of the authority in regard to the investments, management, or administration of the trust.

Tex. Prop.Code Ann. § 114.003 (Vernon 1995).[4] As amended, the statute now provides:[5]

(a) The terms of a trust may give a trustee or other person a power to direct the modification or termination of the trust.

(b) If the terms of a trust give a person the power to direct certain actions of the trustee, the trustee shall act in accordance with the person's direction unless:

 (1) the direction is manifestly contrary to the terms of the trust; or

 (2) the trustee knows the direction would constitute a serious breach of a fiduciary duty that the person holding the power to direct owes to the beneficiaries of the trust.

(c) A person, other than a beneficiary, who holds a power to direct is presumptively a fiduciary required to act in good faith with regard to the purposes of the trust and the interests of the beneficiaries. The holder of a power to direct is liable for any loss that results from a breach of the person's fiduciary duty.

Tex. Prop.Code Ann. § 114.003 (Vernon 2007).[6] " '[T]erms of the trust' means the

---

**3.** Carolyn defines the "Lesikar Defendants" as her brother Woody, individually and as trustee of the Woodrow V. Lesikar Family Trust, as trustee of the Woody K. Lesikar Special Trust, and as independent executor of the Estate of Woodrow V. Lesikar.

**4.** *Amended by* Act of May 12, 2005, 79th Leg., R.S., ch. 148, § 19, 2005 Tex. Gen. Laws 287, 293, effective Jan. 1, 2006.

**5.** The terms of both trusts include any amendments to the Texas Trust Code.

**6.** Section 31 of Acts 2005, 79th Leg., ch. 148 provides:

(a) Except as otherwise provided by a will, the terms of a trust, or this Act, the changes in law made by this Act apply to:

 (1) a trust existing or created on or after January 1, 2006;

 (2) the estate of a decedent who dies before January 1, 2006, if the probate or administration of the estate is pending on or after January 1, 2006; and

manifestation of intention of the settlor with respect to the trust expressed in a manner that admits of its proof in judicial proceedings." *Id.* § 111.004(15).

Here, each of the trusts reserved to the settlor the power to modify or revoke the trust, in whole or in part, and Carolyn does not argue that Mr. Lesikar's decision was the result of coercion, undue influence, lack of capacity, or was otherwise involuntary. To the contrary, Carolyn essentially complains that Woody violated his fiduciary duty to her by *failing* to influence her father to abandon his intent to transfer the Airport Stock to him. She contends that, as a trustee, Woody has a fiduciary duty to the contingent beneficiaries, and must therefore prevent the co-trustee from removing property from the trust or transferring former trust property to him. In effect, she argues that, in his capacity as a trustee, Woody's duty to her as a contingent beneficiary trumps his duty to fulfill the expressed intent of the settlor.

But this argument elevates the rights of a beneficiary above the rights of the settlor. Here, the settlor is also a trustee; thus, under the fiduciary duties that Carolyn suggests, the settlor would share the same duty to prevent the removal of trust property. *See id.* § 114.006. Thus, the settlor could revoke the trust only by breaching his duty to every beneficiary, contingent beneficiary, and remainderman who held an interest, however attenuated, in the trust property. Under this interpretation, the trust would *no longer be freely revocable.* Because a fiduciary must also place the interests of the one to whom a duty is owed above his own interests, it would seem that the settlor, in his capacity as trustee, would have a duty to prevent *himself,* in his capacity as settlor, from revoking the trust. This result is inconsistent with the Trust Code and the terms of the trust documents. *Id.* § 112.051(a) ("A settlor may revoke the trust unless it is irrevocable by the express terms of the instrument creating it or of an instrument modifying it.").

I would hold that Woody's cooperation in the stock purchase was in accordance with the direction of his father, who was empowered to direct his actions. Moreover, Woody's purchase of the stock was not manifestly contrary to the terms of the trust, but complied with the intent of Mr. Lesikar as demonstrated not only in the written terms of the trust, but in the written stock transfer and the endorsed check. *See Haldeman v. Openheimer,* 119 S.W. 1158, 1162 (Tex.Civ.App.1909), *aff'd as modified,* 103 Tex. 275, 126 S.W. 566 (1910).[7] In arguing the contrary, Carolyn relies on authorities that speak generally of the duties a trustee owes to a remainderman or to a contingent beneficiary, but that do not adequately reconcile the exculpatory terms of the trust, the rights of the settlor, the rights of other beneficiaries, and the trustee's obligation to comply with the lawful directions of the settlor:

> In construing a trust, the whole instrument creating or declaring the trust must be considered, in order to determine the settlor's intent, and not merely any particular provision, part, clause, or phrase by itself, and consideration should not be given merely to disjoined

(3) the estate of a decedent who dies on or after January 1, 2006.

7. "It is true that the appellants, though only with a remote and contingent interest, may be allowed to object to a wasteful or extravagant administration of the trust, or to a disposition of the property not provided for in the will or allowed by law; but the fact that their future interest may be affected by a sale of the property or a change in its form would afford no just ground of complaint, if such change or sale was authorized by the will, or to accomplish a purpose either expressly or impliedly provided for by its terms."

parts. All parts, provisions, or terms of the instrument are to be considered, each paragraph provision, or phrase must be read in the light of the whole instrument, and not in isolation, and no clause is to be given undue preference. The meaning of a part of a provision must be determined from the provision as a whole.

*Brown v. Scherck,* 393 S.W.2d 172, 183 (Tex.Civ.App.-Corpus Christi 1965, no writ) (quoting 90 C.J.S. *Trusts* § 161, p. 22–23).

Under the terms of each of the trusts, Mr. Lesikar manifested an intent to exercise control over the trust property during his lifetime. Indeed, the following language concerning a testamentary trust is largely applicable to Mr. Lesikar's rights as settlor:

[Testatrix], as the owner of the property in question, had the absolute right to dispose of it ... as she saw fit, and to put upon the title or the use of the property such limitations as she deemed proper, not in violation of law nor against public policy. [Her] daughter[ ] had only such interest in the property as her mother conferred upon her, and it is not for the courts to say that the limitation created by the trust is unreasonable or unjust, if it be lawful. *Bank v. Adams,* 133 Mass. 170, 43 Am. Rep. 504; *Claflin v. Claflin,* 149 Mass. 19, 20 N.E. 454, 3 L.R.A. 370, 14 Am. St. Rep. 393. In the latter case, the court said: "A testator has a right to dispose of his own property with such restrictions and limitations, not repugnant to law, as he sees fit, and his intentions ought to be carried

out, unless they contravene some positive rule of law, or are against public policy."

*Lanius v. Fletcher,* 100 Tex. 550, 555, 101 S.W. 1076, 1078 (1907). Like the testatrix described a hundred years ago in *Lanius,* Mr. Lesikar, as the settlor, had the right to dispose of his property as he saw fit, and the trustee's primary duty under the terms of the trust at issue was to carry out the settlor's lawful intentions. Here, the settlor's manifest intent was to transfer the Airport Stock out of the trust.[8]

But Carolyn argues that her father had the right to revoke the Family Trust only if he did so in writing and in his capacity as settlor, rather than as trustee. She contends that until such a writing was received by a trustee, her father and brother owed her fiduciary duties. For the reasons discussed below and in the majority's discussion of *Starcrest Trust v. Berry,*[9] I would hold that Mr. Lesikar was not required to provide the written notice Carolyn suggests.

## IV. REQUIREMENTS FOR THE SALE OF THE AIRPORT STOCK

In her seventh issue, Carolyn contends that the Airport Defendants failed to differentiate between actions by Mr. Lesikar in his capacity as Settlor and in his capacity as Trustee. In her ninth issue, Carolyn contends that the transfer of the Airport Stock did not meet the requirements of an amendment or revocation of the Family Trust. According to her interpretation of the trusts, Mr. Lesikar could not transfer the Airport Stock to Woody unless he first removed the Airport Stock from the trust

---

**8.** The majority states that Mr. Lesikar wrote to Carolyn explaining his decision. But Carolyn contests the authenticity of the September 5, 1997 letter that was purportedly written by her father, and this dispute was not resolved in the trial court. In light of this continuing disagreement, I respectfully disagree with the

majority's characterization of this document as a letter from Mr. Lesikar; however, the letter is not necessary to the resolution of the issues presented on appeal.

**9.** 926 S.W.2d 343, 352–53 (Tex.App.-Austin 1996, no writ).

by writing a notice of the revocation, in his capacity as Settlor, and delivering the notice to Woody or to himself, in their capacities as trustees.

I do not read the trusts to impose such a requirement. Mr. Lesikar could combine the removal of the stock from the trust with the transfer of his stock to Woody, to Woody's children, or to a trust for either of them. Simply stated, Mr. Lesikar (as Settlor) could direct himself (as trustee) to make the transfer directly on behalf of the Settlor. *See* Art. II, § 2.1 of Trust ("Trustee may distribute to or apply for the benefit of Settlor's children ... such amounts of trust, income and/or principal as Settlor shall direct in writing."); *see also* TEX. PROP.CODE ANN. § 113.002 ("Except as provided by Section 113.001, a trustee may exercise any powers in addition to the powers authorized by this subchapter that are necessary or appropriate to carry out the purposes of the trust."); *id.* § 113.024 ("The powers, duties, and responsibilities under this subtitle do not exclude other implied powers, duties, or responsibilities that are not inconsistent with this subtitle."). I would therefore overrule Carolyn's first, second, seventh, eighth, and ninth issues.

### V. LIMITATIONS

In her fifth and sixth issues, Carolyn contends that the Lesikar Defendants' limitations defense fails as a matter of law, or alternatively, there are material fact issues concerning the Lesikar Defendants' limitations defense. Because I would affirm the trial court's order on other grounds, I would not reach these issues.

### VI. CONCLUSION

I agree with the majority's conclusion that Mr. Lesikar could and did remove the Airport Stock from the trust corpus without writing and delivering notice to himself; moreover, I agree with the majority that it would be absurd to read the trust

documents to impose such a requirement. I further agree that Carolyn's complaints regarding the sale of the Airport Stock are without merit because the evidence manifests Mr. Lesikar's intent to sell the stock to Woody for $2,000, and Mr. Lesikar had the right and the unchallenged capacity to do so. However, I would hold that this evidence, while important in evaluating the merits of the arguments, does not undermine Carolyn's standing under the Texas Trust Code.

