REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1878

SEPTEMBER TERM, 2014

---

CANDACE GRUEFF

v.

MICHAEL VITO, *et al.*

---

Eyler, Deborah, S.,
Graeff,
*Hotten,

JJ.

---

Opinion by Eyler, Deborah, S., J.

---

Filed: August 31, 2016

Patrick L. Woodward, J., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1

*Michele D. Hotten, J., participated in the hearing of this case while an active member of this Court but did not participate in either the preparation or adoption of this opinion.

In this appeal, we hold that a broadly worded power to amend in an irrevocable trust instrument cannot be used by a majority of beneficiaries to divest a minority beneficiary of her interest in the trust when doing so would be contrary to the settlor's intent in creating the trust. We also hold that, under Maryland common law, a trustee of a revocable trust does not owe a fiduciary duty to contingent remainder beneficiaries while the settlor is alive.

## FACTS AND PROCEEDINGS

This case concerns two trusts created by James B. Vito. James and his wife Mary, one of the appellees, have four children: Candace Grueff, the appellant, and Michael Vito, Judith Seal, and John ("Tim") Timothy Vito, also appellees.[1] The other appellees are James F. Brennan, III, Esquire, Paul H. Ethridge, Esquire, and the MFV Annuity Fund, LLC (the "Fund").

### *The Irrevocable Trust*

On September 16, 1983, James established the James B. Vito Family Trust (the "Irrevocable Trust"), naming his four children as income and residuary beneficiaries. The trust instrument was signed by James and by Paul M. Vito, James's brother, whom James named as Trustee. It provides that the trust cannot be "altered, amended, revoked, or terminated, in whole or in part, by" the Settlor (James). James renounced for himself

---

[1] For ease of discussion, we shall refer to members of the Vito Family by their first names. There is no evidence that either James or Mary have any other living children.

and his estate "any interest, either vested or contingent, including any reversionary right or possibility of reverter, in the principal and income of the Trust[.]"

The trust was funded by a gift "for the immediate benefit" of the four Vito children of the fee simple interest in income-producing real property located in Rochester, New York, that James had contracted to purchase. The trust instrument allows for more assets to be added to the trust estate, and that happened over time. In particular, James, who amassed wealth in commercial real estate, formed various LLCs, which he managed, and made interests in the LLCs part of the trust estate of the Irrevocable Trust (and a Revocable Trust that we shall discuss below). These LLCs were designated "James Properties I," "James Properties II," and so forth. Over time, other assets were added to the trust estate as well.

The Irrevocable Trust instrument provides at Item SECOND that "the Trustee shall at least once each year distribute all the net income and any capital gains of the trust to the beneficial owners in the shares set forth in Item SIXTH below in such partial or periodic distributions as he deems appropriate within his discretion." The shares, as set forth in Item SIXTH, are 25% to each child.

By its terms, the Irrevocable Trust was to terminate after sixteen years from the date of execution, at which time the residuary trust estate would be distributed in equal portions to the four children. Likewise, there would be equal distribution to the beneficiaries if, before the trust terminated, all the trust assets were liquidated and all obligations, liens, and encumbrances on the trust property were satisfied.

Item TENTH of the Irrevocable Trust reads as follows:

- 2 -

This Agreement may be revoked, altered or amended from time to time by an instrument in writing, signed by the holders of not less than seventy-five (75%) interest herein and delivered to the Trustee.

There have been a total of five amendments to the Irrevocable Trust. On March 8, 1995, Michael, Judith, and Tim signed an amendment naming Brennan as Successor Trustee to Paul. On September 1, 1999, all four children signed an amendment extending the termination date for the trust to the earlier of James's death or December 31, 2019. They executed a third amendment on June 16, 2003, further extending the trust termination date to December 31, 2024, removing the alternate provision about James's death, and granting the Trustee authority to enter into certain indemnification agreements on behalf of the trust.

At some point (not specified in the complaint), Paul resigned as Trustee and Brennan took his place.

On June 24, 2011, in the Circuit Court for Montgomery County, Candace filed a petition seeking appointment as guardian of James's property. She alleged that he was mentally incompetent to handle his affairs. The opposing parties included Mary, Judith, Michael, and Tim. In early 2012, the parties settled the guardianship case by an agreement that Mary and Ethridge would be appointed co-guardians of James's property. On March 1, 2012, the court issued an order making those appointments. There was no judicial finding that James was disabled or incompetent.

On May 4, 2012, Brennan resigned as Trustee. A little over two weeks later, on May 21, 2012, Judith, Michael, and Tim executed a fourth amendment to the trust

("Amendment IV") appointing Judith and Michael as Trustees in Brennan's place. One more amendment was made to the trust instrument, which we shall discuss *infra.*

### *The Revocable Trust*

On August 11, 1999, James established the Revocable Trust, naming himself as Trustee. The trust was funded with commercial real estate holdings, including, as noted, interests in the various James Properties, LLCs, and other investments. On December 15, 2004, James executed an amendment to the Revocable Trust that completely restated its terms. In the definition section, it states that "'Trustee' refers to James B. Vito, Mary F. Vito and John F. Brennan while they is [sic] serving as Trustees, and to such other persons or corporations as may succeed [him/her] from time to time as Trustee pursuant to the provisions of Section 11 of this Agreement." (Emphasis omitted.) The amendment is signed by James, as Settlor and Trustee, and by Mary and Brennan, as Trustees.

In the trust instrument (as restated), James expressly reserved the right to alter, amend, or revoke the trust, in whole or in part, at any time. Should he revoke the trust, all trust property covered by the revocation would revert to him. The trust instrument provides that, during James's lifetime, the income and principal from the trust estate are to be distributed to him, as necessary for his support. Upon his death, if Mary survives him, a certain sum of trust assets will be distributed to two marital trusts, for estate tax purposes, with the net income from those trusts, along with discretionary payments from principal, to be paid to Mary. The rest of the trust assets will make up the corpus of a new "Residuary Trust," the net income from which shall be paid to Mary, the four children, and the descendants of the four children "for and during" their lifetimes, and

amounts of the principal may be paid in proportions to them, at the Trustees' discretion. Upon Mary's death, or upon James's death if Mary predeceases him, the principal and any accrued undistributed income of the Residuary Trust shall be held in two trusts, one for estate tax purposes. The assets held in the other trust "shall be allocated among the descendants of the Settlor living at the time of the death of the survivor of the Settlor's spouse and the Settlor, *per stirpes*." Each share allocated to a child of the Settlor shall be placed in a separate trust for the benefit of that child, and shall be distributed to that child if the child has attained the age of 21. (The children all have been over the age of 21 for quite some time.)

James executed a third amendment to the Revocable Trust on December 11, 2006. The amendment provided that upon Mary's death, or his death if Mary predeceases him, the Trustees shall distribute the trust's interest in Craig Air Center Corporation to Tim, and shall distribute its interest in the James Properties III, LLC to Michael's children, in equal shares. That amendment was signed by James, as Settlor and Trustee, and Mary and Brennan, as Trustees.

On January 1, 2007, James assigned to Candace's son, outright and free and clear of any trust, a 10% interest in the James Properties II, LLC. Before then, 50% of that asset was held by the Revocable Trust, and the other 50% was held by the Irrevocable Trust. Thus, after the assignment, the Irrevocable Trust held a 50% interest in the asset, the Revocable Trust held a 40% interest in the asset, and Candace's son held a 10% interest in the asset. The assignment was executed by James, as assignor and Trustee, by

Brennan, as the only other member of that LLC and Trustee, and by Candace's son, as assignee.

On April 8, 2011, James, as Settlor and Trustee, and Mary and Brennan, as Trustees, executed a fourth amendment to the Revocable Trust ("Amendment Four"). That amendment states that upon Mary's death, or James's death if Mary predeceases him, the 40% interest in the James Properties II, LLC held by that trust will be allocated among the four children so as to include in Candace's 25% share the 10% share assigned to her son. Thus, Candace's three siblings each will receive a 25% interest in the James Properties II, LLC portion held by the Revocable Trust and Candace will receive a 15% interest in that asset, making the combination of her interest and that of her son 25%.

On August 18, 2011, Mary and Brennan, as Trustees, executed assignments of the interests in the James Properties II, LLC and the James Properties VII, LLC held by the Revocable Trust to themselves as Trustees of the Mary F. Vito Revocable Trust. Those interests subsequently were assigned by the latter trust to the Fund.

### *The Litigation and Post-Suit Amendment to the Irrevocable Trust*

On August 9, 2013, in the Circuit Court for Montgomery County, Candace filed an eight count complaint against Michael, Judith, Tim, Mary, Brennan, Ethridge, and the Fund.

Counts I, II, IV, and V name Michael and Judith as defendants and concern the Irrevocable Trust. (There is no Count III in the Complaint.) The only counts against

Michael and Judith of relevance to this appeal are Count I and part of Count V.[2]  In Count I, Candace sought to remove Michael and Judith as Trustees of the Irrevocable Trust, on the ground that they misused the funds in the trust, both before and after they became Trustees.  (Most of the dates of the alleged misuses of funds are not specified, but are in the years 2011 and 2012.)  In Count V, Candace sought an accounting by Michael and Judith of the trust assets.

Counts VI through IX name Mary and Brennan as defendants and concern the Revocable Trust.  In Count VI, Candace sought to remove Mary and Brennan as Trustees.  She alleged that they misappropriated and misallocated trust income; failed to make decisions that a reasonably prudent trustee would make in the administration of the trust; and failed to collect monies for the trust from third parties; and their actions were affected by conflicts of interest and bias.  In Count VII, she sought damages, upon similar allegations, including that Mary and Brennan had failed to adequately manage, monitor, and control the trust assets; had drafted and signed, and had James sign, Amendment Four, moving assets out of the trust, when James was "demented"; and that they had breached their fiduciary duties and had acted negligently in managing the trust.

Candace sought injunctive relief in Counts VIII and IX.  She asked the court to set aside the August 18, 2011 assignments of the interests in the James Properties II and VII, LLCs from the Revocable Trust to the Mary F. Vito Revocable Trust, alleging that those

---

[2] As we shall discuss, Counts II, IV, and part of Count V were voluntarily dismissed with prejudice.

assets later were transferred to the Fund, an entity owned and controlled by her three siblings. And finally, she asked the court to find that Amendment Four was void and to set it aside, on the ground that James was not competent when he executed it and was acting under the undue influence of Brennan, Judith, and Michael.

Although Tim, Ethridge, and the Fund were named as defendants, no causes of action were stated against them.[3]

On October 8, 2013, Mary and Brennan filed a motion to dismiss Counts VI through IX (being all the counts against them and all pertinent to the Revocable Trust). They argued that Candace lacked standing to sue. For Count VI, they relied upon Rule 10-712(b), which states that, on petition of an "interested person," a court may remove a fiduciary, and upon Rule 10-103(f)(2), under which, they argued, an "interested person" must be a "current income beneficiary of the fiduciary estate[,]" which in the case of a trust would be a current income beneficiary of the trust. They asserted that Candace was not an "interested person" because she was not a current income beneficiary of the Revocable Trust. Rather, James was the current income beneficiary because, under the terms of the Revocable Trust, the net income was to be paid to him, so long as he was alive. With respect to Counts VII through IX, they alleged that Candace lacked standing to sue under Maryland common law.

---

[3] Ethridge was sued solely in his capacity as co-guardian of James's property. As of May 6, 2015, he no longer occupies that position. *See In re James B. Vito*, 95478 FL, in the Circuit Court for Montgomery County.

On October 21, 2013—two months *after* Candace filed suit and before the court ruled on Mary and Brennan's motion to dismiss—Michael, Judith, and Tim executed a fifth amendment to the Irrevocable Trust ("Amendment V"). Amendment V changed Item SIXTH of the Irrevocable Trust to reduce Candace's 25% beneficial interest in the trust to zero and reallocate it among Michael, Judith, and Tim, resulting in each of them having a 33 1/3% beneficial interest. Then, on November 1, 2013, Michael and Judith filed a motion to dismiss Count I and to partially dismiss Count V of the complaint, which, respectively, sought their removal as Trustees of the Irrevocable Trust and an accounting of that trust. They attached a copy of Amendment V and argued that, by virtue of that amendment, Candace no longer was a current income beneficiary of the Irrevocable Trust and therefore lacked standing to sue, for the same reasons argued by Mary and Brennan with respect to the Revocable Trust.

That same day, Tim and the Fund filed a motion to dismiss on the primary ground that neither one was named in any count in the complaint.

Candace filed oppositions to all three motions to dismiss. With respect to Michael and Judith's motion, she argued that Amendment V to the Irrevocable Trust was not valid and therefore was not effective to divest her of her interest in that trust. Consequently, she remained a current income beneficiary of that trust with standing under Rules 10-712(b) and 10-103(f)(2)to petition to remove Michael and Judith as Trustees and to receive an accounting from them.

In her opposition to Mary and Brennan's motion, Candace argued with respect to Count VI that, under Rule 10-103(f)(1) and (2), she did not need to be a current income

beneficiary of the Revocable Trust to have standing to sue to remove them as Trustees; it was sufficient that she was an "heir" to James and that James was a disabled person. As to Counts VII through IX, Candace argued that she had standing under Maryland common law to challenge the actions of the Trustees that, in her view, had negatively affected the value of the trust assets.

Finally, in response to Tim and the Fund, Candace argued that Tim was a necessary party, under Rule 2-211, because, as a residuary beneficiary of the Revocable Trust, he would be bound by the court's decision on her claims. Also, because Tim was one of the three beneficiaries who signed Amendment V to the Irrevocable Trust, it was necessary to include him as a party to resolve the question whether that amendment was valid. Candace argued that the Fund was a necessary party because it received the assets she was seeking to have returned to the Revocable Trust, and therefore its joinder was required for "complete relief" to be afforded.

On December 19, 2013, the court held a hearing on the motions to dismiss and took them under advisement. It issued a written Opinion and Order, which was entered on January 29, 2014.

The court found that Amendment V to Item SIXTH of the Irrevocable Trust was valid, under Item TENTH of the trust, and therefore was effective to eliminate Candace as a current income beneficiary of the trust. It agreed with Michael and Judith that Candace only could be an interested person, under Rule 10-103, and thus have standing to seek their removal as Trustees of the Irrevocable Trust, if she were a current income beneficiary; and that she could not seek an accounting from Michael and Judith of any

- 10 -

Irrevocable Trust transaction after October 21, 2013, the date of Amendment V. The court dismissed Count I (seeking to remove Michael and Judith as Trustees of the Irrevocable Trust) and Count V (seeking an accounting).

The court also dismissed Count VI (seeking to remove Mary and Brennan as Trustees of the Revocable Trust) on the ground that Candace had to be a current income beneficiary of the Revocable Trust to have standing, and James was the only current income beneficiary. The court further dismissed Counts VII, VIII, and IX, in which Candace made claims for negligence and breach of trust against Mary and Brennan and to set aside various assignments and amendments to the trust, rejecting Candace's argument that, under common law principles, her status as a beneficiary of the Revocable Trust was sufficient to confer standing.

Finally, the court granted Tim and the Fund's motion to dismiss, ruling that no count alleged any claim against them and they were not necessary parties.

Candace filed a timely motion to alter or amend. On May 9, 2014, the court entered an amended Opinion and Order reflecting that Count V was being dismissed only in part for any accounting after October 21, 2013 (the date Amendment V was executed). On November 3, 2014, the remaining Counts (II, IV, and part of V) were resolved through mediation and were voluntarily dismissed with prejudice.

On November 5, 2014, James died.[4]  Candace filed a notice of appeal on

November 7, 2014.  She presents three questions for review, which we have rephrased:

I.      Did the circuit court err by dismissing Count I and part of Count V, concerning the Irrevocable Trust, on the ground that Candace lacked standing?

II.     Did the circuit court err by dismissing Counts VI through IX, concerning the Revocable Trust, on the ground that Candace lacked standing?

III.    Did the circuit court err by dismissing Tim and the Fund on the ground that neither was a necessary party?

For the following reasons, we shall reverse the judgments of the circuit court in

part, affirm in part, and remand for further proceedings not inconsistent with this opinion.

**DISCUSSION**

**I.**

**Counts I and V (Michael and Judith/Irrevocable Trust)**

Candace contends the circuit court erred in deciding that she was not a current

income beneficiary of the Irrevocable Trust and therefore lacked standing to sue to

remove Michael and Judith as Trustees and to obtain an accounting from them.  She

argues that, contrary to the court's ruling, Amendment V, by which her brothers and

sister purported to divest her of her interest in the trust, including her interest as a current

income beneficiary, is not valid and therefore is not effective.  She complains that the

_____

[4] None of the parties mentioned the fact of his death in their briefs or in oral argument before this Court.  This Court determined on its own, upon searching the guardianship case on the Maryland Judiciary database and from public information that flowed from that search, that James had died.

- 12 -

court improperly interpreted Item TENTH of the trust, which contains the power to amend, by reading it in isolation, without considering James's intentions as the Settlor, as expressed in the trust when read as a whole. She argues that, when read in the context of the entire trust, the power to amend in Item TENTH cannot be used to divest one beneficiary of his or her interest in the trust. Accordingly, Amendment V was invalid and ineffective, and she remains a current income beneficiary of the trust and an "interested person" with standing to seek removal of Michael and Judith as Trustees. For the same reason, she argues she has standing to seek an accounting.

Michael and Judith counter that the plain language of Item TENTH of the Irrevocable Trust is paramount, and it gave them and Tim, acting together and holding 75% of the beneficial interest in the trust, the power to take Candace's 25% beneficial interest and give it to themselves. They maintain that this language is not inconsistent with any other provision of the trust. Consequently, Amendment V was valid and effective. Upon its execution, Candace no longer had any beneficial interest in the Irrevocable Trust, was not a current income beneficiary of the trust, and lacked standing to pursue any of the claims against them. Pointing to language in the trust instrument that they interpret as giving the Trustee discretion to distribute the trust income to the beneficiaries, they assert that none of the beneficiaries had a vested interest in the trust estate.[5]

---

[5] As we explain in Section II, dealing with the Revocable Trust, under Rule 10-712, an "interested person," as defined in Rule 10-103(f)(2), may petition for the removal

(Continued…)

- 13 -

The parties suggest, correctly, that the court's ruling on this issue should be reviewed as the grant of a motion for summary judgment, because the court considered a fact outside the pleadings—the execution of Amendment V to the Irrevocable Trust—in making its decision. *See* Md. Rule 2-322(c) (stating, in relevant part, that, on a motion to dismiss, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment"). Indeed, as noted, Amendment V was executed by Michael, Judith, and Tim on October 21, 2013, after Candace filed her complaint.

"Summary judgment may be granted when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Smith v. Rowhouses, Inc.*, 223 Md. App. 658, 664 (2015), *aff'd*, 446 Md. 611 (2016); Md. Rule 2-501(f). We review "a circuit court's grant of summary judgment for legal correctness under a non-deferential standard of review." *Bd. of Pub. Works v. K. Hovnanian's Four Season at Kent Island, LLC*, 443 Md. 199, 214–15 (2015) (citations omitted).

The parties do not dispute that Amendment V was executed as stated above and that what it says is material. The only issue is its legal significance, *i.e.*, was it effective to eliminate Candace as a beneficiary of the Irrevocable Trust. That is a question of law

---

(…continued)
of a trustee. Michael and Judith do not take the position that if Candace *is* a current income beneficiary of the Irrevocable Trust, that is not enough for her to be an interested person under Rule 10-103(f)(2).

that we address *de novo*. *Toms v. Calvary Assembly of God, Inc.*, 446 Md. 543, 551 (2016); *State v. Johnson*, 367 Md. 418, 424 (2002).

**(a)**

At common law, "neither some nor all of the beneficiaries [of a trust] have an implied power to modify the trust." George T. Bogert et al., *Bogert's Trusts and Trustees* § 992 (2015) (hereinafter "*Bogert*") (footnotes omitted).[6] The power to amend may be granted by the settlor in the trust instrument, however. *Id*. When it is, "questions of construction may arise as to the extent of the power, and as to the method of its exercise." *Id.* at § 993 (footnotes omitted). "The ways in which the power may be used to alter or modify the trust will be determined by the language of the instrument, which may provide for alterations by described methods only, or may be general and without qualification." *Id.* (Footnotes omitted).[7]

---

[6] *Bogert's Trusts and Trustees* is an authoritative guide on trusts, which is continually updated. Because different legal scholars contribute to each section, and the sections are updated at different times, for ease of discussion we shall use the above citation throughout this opinion, each of which references the most current September 2015 update, available through Westlaw.

[7] The common law of trusts may be superseded or supplemented statutorily. In 2014, the Maryland General Assembly enacted the Maryland Trust Act ("the Act"), which is codified in Title 14.5 of the Estates and Trusts Article ("ET"). The Act supplements the common law of trusts and principles of equity. ET § 14.5-106. At ET section 14.5-410, it addresses modifications of trusts, stating at subsection (a)(2) that "[a] noncharitable, irrevocable trust may be modified on consent of the trustee and all beneficiaries if the court concludes that modification is not inconsistent with a material purpose of the trust." The same section goes on to provide that, when all the beneficiaries to such a trust do not consent to a proposed modification, the proposed modification "may be approved by the court if the court is satisfied that: (1) If all beneficiaries had

(Continued…)

"In deciding the meaning of various words used to describe the beneficiaries [of a trust] and their interests, the courts naturally will seek the settlor's intent and to this end will consider the settlor's circumstances and all the provisions of the trust instrument." *Id.* at § 182 (footnote omitted). In this regard, "[*t*]*he process of construction of trust provisions is the same as that used in the construction of wills*[.]" *Id.* (Emphasis added.)

*Childs v. Hutson*, 313 Md. 243 (1988), in which the Court of Appeals construed a written power granted in a will, is instructive. The testatrix had a son and two daughters. Daughter Emilia, and Emilia's daughter Victoria, lived with the testatrix on the family farm. The will granted Emilia a life estate in the family farm and the power to "sell, mortgage, lease, rent *or in any other manner whatsoever to dispose of the entire estate, or any portion thereof*[.]" *Id.* at 244 (emphasis added). The will provided that, if the family farm were sold, the net proceeds would be distributed $1,000 to the son, 1/3 to the other daughter, and 2/3 to Emilia.

---

(…continued)

consented, the trust could have been modified . . . under this section; and (2) The interests of a beneficiary that does not consent will be adequately protected." *Id.* at § (d).

The Act became effective on January 1, 2015, after suit was filed in the instant case and after the circuit court granted the motions to dismiss. It "applies to all trusts created before, on or after January 15, 2015 [and] to all judicial proceedings concerning trusts commenced on or after January 1, 2015." *Id.* at § 14.5-1006(a)(1) & (2). It "does not apply to judicial proceedings commenced before January 1, 2015[.]" *Id.* at § (a)(3). However, "[a] rule of construction or presumption provided in this title applies to trust instruments executed before January 1, 2015, unless there is a clear indication of a contrary intent in the terms of the trust[.]" *Id.* at (a)(4).

We read this language to mean that the Act was not controlling when the circuit court made its ruling concerning the trusts in this case. Clearly, if the Act had controlled when the Irrevocable Trust was amended to eliminate Candace's beneficial interest, the amendment would not have survived.

The testatrix died about six months after executing her will. Thereafter, Emilia deeded the family farm to Victoria, in fee simple, for no consideration. Emilia then died, as did her brother. Emilia's sister and her brother's children petitioned the circuit court to void Emilia's gift of the family farm to Victoria. They argued that by giving the family farm to Victoria, Emilia had used her power "to dispose" of "any portion" of the estate improperly, so as to eliminate their remainder interests in the family farm. The circuit court agreed and voided the transfer. This Court affirmed in an unreported opinion. The Court of Appeals granted a petition for writ of *certiorari* to determine whether a broadly worded power to dispose of property granted to a legatee in a will must be interpreted narrowly based on the testator's intent.

The Court recognized that by its plain language, the pertinent provision of the will gave Emilia the power to do what she did: "to dispose of" (which would include to give away) "any portion" of the estate (which would include the family farm). Noting that "the cardinal rule in will construction cases is to ascertain the intention of the testatrix as determined from the four corners of the will[,]" *id.* at 245 (citations omitted), the Court reasoned that "words [in a will] are not to be considered in isolation, but . . . in association with the other provisions of the will" and "the overall testamentary plan of the testatrix." *Id.* at 247. The Court concluded from a reading of all the provisions of the will that it was the testatrix's intention that the family farm would be sold and that the sale "would result in a distribution of proceeds" to all three of her children. *Id.* at 248. It held that a literal reading of the language of the power of sale "to permit a gift of the

[family farm] would defeat [the testatrix's] intention[.]" *Id.* at 247. The Court affirmed the circuit court's ruling voiding the deed to Victoria.

The same principle, that the meaning of a provision in a will (or trust) will be derived from its plain language as read in the context of the entire instrument, so as to comport with the intention of the testator or settlor, was applied by the Court of Appeals in *Leroy v. Kirk*, 262 Md. 276 (1971). In that case, the testatrix's will bequeathed "all [her] personal property" to one "BETTY JENSEN LEROY . . . if she survives me." *Id.* at 278. The estate consisted of real property, which was to be sold upon the testatrix's death, cash and stocks, and items of tangible personal property. In addition to the bequest to Leroy, two small bequests of money were made to an individual and a charity, with the residuary estate to go to a hospital and an animal rights organization.

After the testatrix died and the will was admitted to probate, Leroy challenged the distribution of estate assets in the circuit court, arguing that "personal property" includes tangible and intangible personal property, so the bequest to her not only included tangible assets, such as furniture, but also intangible assets, *i.e.*, the cash and stocks. The circuit court rejected this argument, and the Court of Appeals agreed. It explained:

> To divine the intention of a testator is the primary and paramount goal in the construction of his will. The search is not for his presumed but for his expressed intention. What must be sought is the true meaning of his words, not what he meant as distinguished from what his words express, "but simply what is the true meaning of his words; not merely what *he* meant, but what *his words* mean." [Edgar G.] Miller, [Jr., *The*] *Construction of Wills* [*In Maryland*] § 10[, at 44–45 (The Lord Baltimore Press 1927) (emphasis in original) (footnote omitted)]. What the words express is to be interpreted according to their plain meaning and import. This expressed intention must be gathered from the language of the entire will, particularly

- 18 -

from the clause in dispute, read in the light of the surrounding circumstances when the will was made.

*Id.* at 279–80 (emphasis in original) (citing *Marty v. First Nat'l Bank of Balt.*, 209 Md. 210, 216–17 (1956)).

The Court affirmed, holding that a literal reading of the words "personal property" to include tangible and intangible personal property would be inconsistent with other provisions of the will, rendering some of them meaningless, and therefore would not be in keeping with the intention of the testatrix. *Cf. King v. Bankerd*, 303 Md. 98, 107 (1985) (limiting otherwise broad power of attorney).

**(b)**

We return to the case at bar. Item TENTH of the Irrevocable Trust is a generally worded power. It allows the "Agreement" to "be revoked, altered or amended from time to time by an instrument in writing, signed by the holders of not less than seventy-five (75%) interest" in the trust, and delivered to the Trustee. Read broadly, the "alter and amend" language in Item TENTH would seem to give the holders of a 75% beneficial interest in the trust the power to make *any* change to the trust instrument, including, as Michael and Judith argue, to eliminate the beneficial interest of the 25% beneficiary and allocate it among the remaining beneficiaries. Item TENTH does not specify that that can be done, however, and therefore we must look to the entire trust instrument to determine whether such a reading of Item TENTH is consistent with James's intention as the Settlor of the trust.

The Irrevocable Trust is entitled "James B. Vito Family Trust." When James created it, the Vito family consisted of James, Mary, and their four children. In the second "Whereas" clause, James states that he is giving the trust the fee simple interest in certain real property "for the immediate benefit of his children," who in the same clause are listed by name and designated "Beneficial Owners" or "Beneficiaries." In the third "Whereas" clause, James states that "it would facilitate matters" for title to the real property with which the trust is to be funded to be consolidated and for the collection of income, payment of expenses, and other management of the property to be "handled by one person" until the property is liquidated and distribution can be made "*to the beneficiaries*[.]" (Emphasis added.) "[T]o accomplish such purposes," he gives his right, title, and interest in the property to a Trustee, to hold in trust *in equal shares* for his four children:

> NOW, THEREFORE, to accomplish such purposes the Settlor does hereby give all his right, title and interest in and to the fee interest in said property to PAUL M. VITO, as Trustee, *in equal shares for his children*, CANDACE VITO GRUEFF, JUDITH A. VITO, MICHAEL A. VITO, and JOHN T. VITO, and Settlor does hereby establish a Trust Fund subject to the terms and conditions hereof under which the Trustee agrees to hold said fund, *all as herein provided for the benefit of and in behalf of Settlor's said children* and the Trustee agrees to transfer the title to the buildings and improvements on said property to Settlor at the time of settlement on the purchase of said property by a Bill of Sale.

(Emphasis added.)

As mentioned above, James was a successful commercial real estate entrepreneur, and many of his assets were in the form of income-producing commercial properties. The above clauses in the Irrevocable Trust make clear that his intention in creating the

- 20 -

trust was to benefit his four children, equally and immediately, by placing a particular piece of commercial real property, which needed management and would best be managed by a third party, into the hands of a trustee. The trust provided that additional assets could be added to the trust estate in the future, which happened; and for the most part those assets also were in the form of commercial real estate that, like the initial trust asset, needed management.

James's intention to benefit each of his four children equally also is reflected in Item FOURTH of the trust instrument. It directs that when the trust is terminated, the trust estate shall be "paid over, transferred and delivered to the beneficiaries in the shares set forth in Item SIXTH," *i.e.*, 25% to each child (identified by name). Thus, it was James's expectation that all four children would benefit equally from the trust assets when the trust came to a close. And, pursuant to Item EIGHTH, that intention was to be fulfilled prior to the termination of the trust even if one or more of the children were to die:

> In the event of the death of any of the issue of Settlor, prior to the termination of this Trust, the beneficial interest herein of such deceased person shall pass *to his or her estate.*

(Emphasis added.) Indeed, there is no provision in the trust instrument that evidences any intention on James's part to benefit some, but not all, of the children, or to benefit them unequally.

When the trust instrument is considered as a whole, a reading of Item TENTH to allow the holders of a 75% interest, *i.e.*, three children, to divest the holder of the remaining 25% interest, *i.e.*, one child, of that interest is inconsistent with James's clear

- 21 -

intention to benefit all four of his children, and to do so equally. He established the trust so its real estate assets could be managed for the benefit of all the children, not to give three children the opportunity to take the benefits of the trust for themselves, to the detriment of the fourth child.

Moreover, the meaning of Item TENTH advocated by Michael and Judith would produce an absurd result. If that item is interpreted to encompass the power of the holders of a 75% interest to amend the trust to eliminate the 25% interest of the remaining beneficiary and allocate that interest among themselves, so they each hold a 33 1/3% interest, the 75% quorum never could be satisfied again, and the 75% clause would be rendered nugatory. Obviously, two owners of a 33 1/3% interest cannot meet the 75% quorum. Therefore, any subsequent amendment would have to be by unanimous consent, contrary to the plain wording of Item TENTH. And, if the 33 1/3% interest holders agreed to amend the trust instrument again, to redistribute their interests to be 50% in one beneficiary and 25% each in the other two, the 75% quorum could be satisfied, but the Settlor's clear intention to confer equal benefits would be further undermined.

Michael and Judith also argue that because Item TENTH grants the beneficiaries holding a 75% interest in the trust the power to *revoke* the trust, which is a "more significant power than" the power to amend the trust, we should not give Item TENTH a narrow interpretation. This argument lacks merit. If the trust were revoked by the action of the holders of a 75% interest in the trust, the trust would terminate and the trust estate would be distributed equally to the four children. Revocation would not result in the 25% beneficiary who did not participate in the decision to revoke losing his or her interest in

the trust. Thus, revocation would not run contrary to James's intention to benefit all his children equally.

The power to revoke, alter, or amend the trust, as provided in Item TENTH, may be used as a vehicle to advance the purposes of the trust, as it has been used in the past, but may not be used to undermine James's clear intention, in establishing the trust, to benefit each of his four children and to do so equally. As that item may not be interpreted so as to run contrary to James's intent, we hold that it did not give Michael, Judith, and Tim, holders of a 75% interest in the trust, the power to take Candace's 25% interest in the trust. Amendment V, which purported to do so, is invalid and of no effect. Candace still has the 25% interest in the trust she was given "immediately" when the trust was created.

**(c)**

Michael and Judith maintain that, even if Amendment V is invalid and ineffective, as we have held, the circuit court still was correct in ruling that Candace is not a "current income beneficiary" of the Irrevocable Trust and therefore lacks standing to sue to remove them as Trustees and for an accounting. Specifically, they argue that Item SECOND gives the Trustee discretion to distribute trust income to the beneficiaries, and so it cannot be said that Candace (or any of the beneficiaries) are "current income beneficiaries" of the trust.

This argument is based on a misreading of the language of Item SECOND. That item states: "the Trustee *shall at least once each year distribute all the net income and any capital gains of the trust to the beneficial owners in the shares set forth in item*

- 23 -

*SIXTH* below[.]" (Emphasis added.)  The word "shall" in this context has a mandatory meaning.  Every year, the Trustee *must* distribute *all the net income* and *any capital gains* to the beneficiaries.  The words "at least once a year" give the Trustee discretion about the timing, within a given year, of the distribution.  There may be one single distribution, or several periodic distributions.  But in a given year, the distribution of all the net income and any capital gains must be made to the beneficiaries.  Therefore, all four of the Vito children are "current income beneficiaries" of the Irrevocable Trust.

As a current income beneficiary of the Irrevocable Trust, Candace was, and still is, an "interested person" with standing to sue to remove Michael and Judith as Trustees.  She also has a sufficient interest in the trust to seek an accounting.  The circuit court erred in ruling otherwise.

**II.**

**Counts VI through IX (Mary and Brennan/Revocable Trust)**

As explained, the circuit court granted Mary and Brennan's motion to dismiss all the counts against them on two grounds, both based on standing.  In Count VI, Candace sought to remove Mary and Brennan as Trustees of the Revocable Trust, pursuant to Rule 10-712(b), which provides that a petition for removal may be filed by an "interested person," as defined in Rule 10-103(f)(2).  The court ruled that Candace was not an "interested person" because she was not a current income beneficiary of the Revocable Trust; therefore she lacked standing to petition to remove Mary and Brennan as Trustees.

In Counts VII through IX, Candace sued Mary and Brennan for breach of fiduciary duty, negligence, breach of trust, and to set aside transactions and transfers of

- 24 -

trust property. The court ruled that standing to bring these claims is governed by Maryland common law; that there were no cases on point; but that, generally, a remainder beneficiary of a revocable trust lacks standing to sue for such causes of action.

Candace contends both these rulings were legally incorrect and the motion to dismiss should have been denied.

The decision to grant a motion to dismiss is a legal question, and therefore we review the circuit court's ruling *de novo*. *Gasper v. Ruffin Hotel Corp. of Md., Inc.*, 183 Md. App. 211, 226 (2008). We do not accord any special deference to the circuit court's legal conclusions. *Patton v. Wells Fargo Fin. Md., Inc.*, 437 Md. 83, 95 (2014).

**(a)**

## Count VI – Interested Person

"Procedures for the removal of a fiduciary shall be conducted by the court in accordance with the provisions of the Maryland Rules applying to a fiduciary." Md. Code (1974, 2011 Repl. Vol.), § 15-112(b) of the Estates and Trusts Article ("ET"). A "fiduciary" includes "a trustee acting under any inter vivos or testamentary trust over which the court has been asked to assume or has assumed jurisdiction[.]" Md. Rule 10-103(c).

As noted, Rule 10-712(b) allows an "interested person" to "file a petition to remove a fiduciary." In pertinent part, Rule 10-103(f) defines an "interested person" as follows:

> (1) In connection with a guardianship of the person or the authorization of emergency protective services, "interested person" means the minor or the disabled person; the guardian and heirs of that person; a

governmental agency paying benefits to that person or a person or agency eligible to serve as guardian of the person under [ET] § 13-707; the Department of Veterans Affairs as directed by [ET] § 13-801; and any other person designated by the court.

(2) In connection with a guardianship of the property or other fiduciary proceedings, "interested person" means a person who would be an interested person under subsection (f) (1) of this Rule and a current income beneficiary of the fiduciary estate; a fiduciary and co-fiduciary of the fiduciary estate; and the creator of the fiduciary estate.

In their motion to dismiss, Mary and Brennan argued that subsection (f)(2) must be read to mean that for purposes of bringing a fiduciary proceeding an "interested person" who is not a fiduciary or co-fiduciary or creator of the estate must satisfy subsection (f)(1) *and also* must be a "current income beneficiary of the fiduciary estate," here, the Revocable Trust. Candace countered that when read properly and in context, subsection (f)(2) means that an "interested person" includes both one who satisfies subsection (f)(1) and one who is a current income beneficiary; it is not necessary to be both. She argued that as an heir of a disabled person (James), she was an "interested person" under subsection (f)(1), which was sufficient to make her an interested person under subsection (f)(2). The circuit court agreed with the interpretation offered by Mary and Brennan, and ruled that Candace was not an "interested person" because she was not a current income beneficiary of the Revocable Trust under subsection (f)(2).

When the motion to dismiss was pending, Candace did not satisfy the requirements to be an interested person under subsection (f)(1) and also was not a current income beneficiary of the Revocable Trust under subsection (f)(2). With respect to subsection (f)(1), there never was a proceeding for the guardianship of the *person* of

- 26 -

James.  The proceeding that Candace brought in 2011 was for the guardianship of his *property*, and there was no finding in that proceeding that James was disabled.  Indeed, there was no such finding in any proceeding.  The fact that Candace possibly was one of James's heirs (if he did not have a will, which was not alleged), and that she was of the view that he was disabled, in the absence of any such finding, did not make her an "interested person" under subsection (f)(1).  And with respect to subsection (f)(2), Candace conceded that she was not a current income beneficiary of the Revocable Trust when the motion was decided.

Accordingly, as neither the heir of a disabled person nor a current income beneficiary of the Revocable Trust, Candace was not an "interested person" for purposes of a fiduciary proceeding to remove the Trustees, no matter how the language of subsection (f)(2) is interpreted.

**(b)**

**<u>Counts VII through IX – Maryland Common Law</u>**

Concepts of standing and duty are interrelated.  To have standing to sue, a plaintiff must have "suffered an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by a decision in the plaintiff's favor." *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 491 (2014) (internal quotation marks and citations omitted).  "Standing may be grounded on a statute conferring a legal interest or privilege[,]" *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 432 Md. 292, 313 (2013) (citing *Comm. for Responsible Dev. on 25th St. v. Mayor & City Council of Balt.*, 137 Md. App. 60, 72 (2001)), or in the common law.  *See Spry v. Gooner*, 190 Md. App. 1, 8

(2010) ("[S]tanding to file exceptions to an administration account is governed by common law."). Even when a statute or rule provides a definition for an "interested person," a person who does not meet that definition may have standing to pursue a claim under the common law. *Id.* at 7–10.

There are no Maryland cases addressing whether a trustee of a revocable trust owes a duty to a beneficiary who holds a contingent remainder interest in the trust. In a learned treatise on trusts, the author explains that the settlor's power to revoke a trust "is, in substance, the functional equivalent of outright ownership of the trust assets[,]" and for that reason, "the duties of a trustee of a revocable trust are owed exclusively to the settlor[.]" *Bogert,* at § 964 (footnotes omitted). Case law from other jurisdictions supports that analysis.

In *Fulp v. Gilliland*, 998 N.E.2d 204 (Ind. 2013), a settlor created a revocable trust for her own benefit, naming herself as trustee. The trust estate included a farm, and under the trust terms, upon the settlor's death, the farm was to be sold and the proceeds evenly distributed to her three children. Acting as trustee, the settlor contracted to sell the farm to her son for a price below fair market value. She then resigned as trustee and her daughter became successor trustee. The daughter refused to close on the sale, arguing that the settlor, in her role as trustee, had breached her fiduciary duty to the remainder beneficiaries by selling the farm for less than fair market value. The son sued his sister/trustee for specific performance. The trial court denied relief, ruling that the settlor/trustee owed a trust duty to the remainder beneficiaries and that she breached the duty.

- 28 -

Ultimately, the case came before the Supreme Court of Indiana, which reversed. The court explained that, as long as a revocable trust remains revocable, and the settlor is the present beneficiary, the trustee owes his fiduciary duty to the settlor only, and not to the remainder beneficiaries. The settlor's children, as remainder beneficiaries, did not have vested interests in the trust. They had contingent remainder interests that could be eliminated by the settlor because the terms of the trust gave her free rein to do as she pleased with the trust estate. Recognizing a duty on the part of the trustee to the beneficiaries in that circumstance would "create conflicting rights and duties for trustees and essentially render revocable trusts irrevocable." *Id.* at 205.[8]

Likewise, when a settlor creates a revocable trust for his own benefit and is *not* a trustee, the trustee's fiduciary duty is owed to the settlor only, not to the remainder beneficiaries, so long as the settlor is alive and can exercise discretion to revoke the trust. In *Estate of Giraldin*, 55 Cal. 4th 1058, 1062 (2012), the Supreme Court of California explained:

> A revocable trust is a trust that the person who creates it, generally called the settlor, can revoke during the person's lifetime. The beneficiaries' interest in the trust is contingent only, and the settlor can eliminate that interest at any time. When the trustee of a revocable trust is someone other than the settlor, that trustee owes a fiduciary duty to the settlor, not to the beneficiaries, as long as the settlor is alive. During that time, the trustee needs to account to the settlor only and not also to the beneficiaries. When the settlor dies, the trust becomes irrevocable, and the beneficiaries' interest in the trust vests.

---

[8] The court's decision was based on statutory law and independently on common law.

(Footnote omitted.) *See also Brundage v. Bank of America*, 996 So. 2d 877, 882 (Fla. Dist. Ct. App. 2008) (A trustee of a revocable trust created for the settlor's benefit during his lifetime owes a fiduciary duty to the settlor and "not the remainder beneficiaries, who not only have no vested interest but whose contingent interest may be divested by the settlor prior to her death[.]"); *Moon v. Lesikar*, 230 S.W. 3d 800, 806 (Tex. App. 2007) (until the death of the settlor and present beneficiary of a revocable trust, who also is a co-trustee, the contingent remainder beneficiaries do not have vested interests and lack standing to bring suit against a trustee for breach of fiduciary duty); *In re Malasky*, 736 N.Y.S. 2d 151, 152 (N.Y. App. Div. 2002) (during the joint life of co-settlors/trustees of a revocable trust for their own benefit, their children as contingent remainder beneficiaries had no pecuniary interest in the trust and therefore lacked standing to file exceptions to the first accounting).

Candace argues that if she could not take legal action during James's lifetime to challenge dissipation by the Trustees of the assets of the Revocable Trust, the assets could be gone by the time of James's death. She cites *In re Clarke's Will*, 198 Md. 266 (1951), and *Spry*, *supra*, in support. These cases are inapposite.

*In re Clarke's Will* concerned a residuary trust created under the will of the testator (the great-grandfather) who died, leaving a wife and son (the grandfather). The terms of the trust gave the widow the net income of the trust for her life and, if her son (the grandfather) survived her (which he did), he would receive the net income from the trust. Upon the grandfather's death, the trust estate would be distributed to his "issue." The grandfather married and had three sons, two of whom had no children and one of

whom (the father) had one child. That child (the great-grandson), by his mother as next friend, brought suit against the trustee for a declaratory judgment, to determine whether he was the "issue" of his grandfather within the meaning of that term in the trust, and for an accounting to determine whether the trustee was dissipating assets. In a somewhat circular argument, the trustee maintained that the great-grandson was not the "issue" of his grandfather, and therefore did not have standing to bring any of the claims.

The Court of Appeals held that the great-grandson indeed was the "issue" of his grandfather. The Court noted that the great-grandson had a contingent remainder interest in the trust as his interest depended upon his outliving his grandfather. On the issue of standing, the Court stated, "if the [great-grandson] has any interest at all he is entitled to invoke the court's protection[.]" *Id.* at 273. Thus, the great-grandson could challenge the trustee's handling of the trust assets on allegations that the trustee was dissipating them.

The trust in *In re Clarke's Will* was not a revocable trust like the trust at issue here. Moreover, there is nothing similar about the nature of the contingency of the beneficiary's interest. The interest in *In re Clarke's Will* was contingent in the sense that many interests are, *i.e.*, the beneficiary would have to be alive for his interest to vest. Nothing else would interfere with the great-grandson's interest vesting. Here, Candace's interest was contingent upon her father's not exercising the complete discretion he had to revoke the trust.

In *Spry*, the settlor created a revocable *inter vivos* trust. The trust provided that upon the settlor's death, specific trust assets were to be distributed to certain named individuals and the rest of the trust assets would be divided equally between his two

children, assuming they had attained a certain age. When the settlor died, the trust became irrevocable. The children, who had attained the designated age, filed exceptions to the first administration account for their father's estate, asserting that it could affect their interests under the trust. The Orphans' Court for Cecil County dismissed the exceptions for lack of standing, because the sons did not meet the definition of "interested person" in ET section 1-101(i). We reversed, holding that because standing to file exceptions to an administrative account is based on common law, an individual who is not an "interested person" under the statutory definition still may file exceptions. We concluded that the sons had a beneficial interest in the trust, and therefore they had standing to file exceptions.

Although the trust in *Spry* was created as a revocable trust, it no longer was revocable at the time of the ruling of the orphans' court and our decision in that case. Therefore, it is not pertinent to the question of standing with respect to the Revocable Trust in the case at bar.

During James's lifetime, he was the sole present beneficiary of the Revocable Trust, and Mary and Brennan, as Trustees, owed a fiduciary duty to him. Candace and her three siblings had remainder interests in the trust and those interests were wholly contingent upon James's not taking action to revoke the trust or to amend it to eliminate some or all of their interests. Mary and Brennan did not owe a fiduciary duty to Candace or anyone other than James. Under common law standing principles, the absence of any duty to Candace on the part of the Trustees is fatal to her claims for breach of trust, negligence, and so forth. Moreover, during James's lifetime, Candace did not have a

- 32 -

beneficial interest in the Revocable Trust in that the trust assets were in the complete control of her father and the trust could be revoked at any time. Accordingly, the circuit court's decision to dismiss Counts VII through IX was legally correct.

As noted above, James was alive throughout the proceedings below, including when the court granted Mary and Brennan's motion to dismiss. He died two days after there was a final judgment in the case. In this opinion, we have reviewed the rulings that were made in the circumstances that they were made; specifically, with respect to the Revocable Trust, that James was alive. James's death rendered the Revocable Trust irrevocable. Whether, post James's death, Candace is in a position to bring claims against Mary and Brennan for alleged breaches of the duties they owed James as the Settlor is a question not before us. *See, e.g., Siegel v. Novak*, 920 So. 2d 89, 95 (Fla. Dist. Ct. App. 2006) (holding that, after the death of the settlor of a revocable trust, the beneficiaries had standing to sue the trustee, who was not the settlor, to challenge certain pre-death withdrawals that they contended were outside the purpose of the trust); *Moon*, 230 S.W. 3d at 804 ("After the death of the settlor, the beneficiaries of a revocable trust have standing to challenge pre-death withdrawals from the trust which are outside the purposes authorized by the trust and which were not approved or ratified by the settlor personally or through a method contemplated by the trust instrument[.]" (Citations omitted)); *Brundage*, 996 So. 2d at 882 ("[O]nce the interest of the contingent beneficiary [of a revocable trust] vests upon the death of the settlor, the beneficiary may sue for breach of a duty that the trustee owed to the settlor/beneficiary which was breached during the lifetime of the settlor and subsequently affects the interest of the vested

beneficiary.").  We note that any such claim would be governed by the Maryland Trust Act.[9]

## III.

## Tim and the Fund

Finally, Candace contends the circuit court's ruling that Tim and the Fund were not "necessary parties" was in error.  Rule 2-211 states in relevant part:

(a) **Persons to be joined.**  Except as otherwise provided by law, a person who is subject to service of process shall be joined as a party in the action if in the person's absence

   (1) complete relief cannot be accorded among those already parties, or

   (2) disposition of the action may impair or impede the person's ability to protect a claimed interest relating to the subject of the action or may leave persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations by reason of the person's claimed interest.

In its decision, the circuit court found that "[w]hile Timothy and [the] Fund may have an interest in the outcome of this litigation, the [c]omplaint still must assert a valid cause of action against Defendants in order for them to respond to and defend against the claims."  Because no valid causes of action were asserted, the court dismissed the claims,

---

[9] We note as well that, although Candace made occasional references in her complaint and in her briefs in this Court to James having been incompetent when certain transfers were made from the Revocable Trust, she has not argued that the Revocable Trust became irrevocable due to James's becoming incapacitated.  As we have explained, there was no judicial finding at any time that James was disabled mentally or otherwise.  Moreover, although the Act did not apply to the proceedings, it is worth observing that it clearly provides that a revocable trust does not become irrevocable due to the incompetency of the settlor.  *See* ET § 14.5-601(c).

- 34 -

without prejudice, with leave for Candace to amend. The court's standing rulings granting the motions to dismiss all other claims essentially foreclosed any amendment to the complaint regarding Tim and the Fund as necessary parties.

The reason Candace offered to support including Tim as a party was that he participated in adopting Amendment V to the Irrevocable Trust and therefore he was a necessary party for the court to decide whether that amendment was valid. That issue was decided below without the need for Tim to be a party and has been resolved as a matter of law in this appeal. Tim was not and is not a necessary party. With respect to the Fund, Candace maintained that it was a necessary party because the Trustees of the Revocable Trust transferred certain trust assets to it. Our holding that Candace does not have any viable claims regarding the Revocable Trust compels the conclusion that the Fund is not a necessary party to this litigation either.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY DISMISSING COUNT I AND PART OF COUNT V REVERSED. JUDGMENTS OTHERWISE AFFIRMED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY THE APPELLANT AND ONE-HALF BY THE APPELLEES.**